Filed 2/9/24 Opinion following rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BIOCORRX, INC., et al., | |
| Plaintiffs and Respondents, | G061535 |
| v. | (Super. Ct. No. 30-2021-01195606) |
| VDM BIOCHEMICALS, INC., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Martha K. Gooding, Judge. Affirmed in part and reversed in part.

Vegh IP Legal, Stephen Z. Vegh; Amin Talati Wasserman and William Paul Cole for Defendants and Appellants.

Samini Baric Katz, Michael I. Katz and Ignacio J. Lazo; Katz Law Office, Michael I. Katz and Byron H. Ruby for Plaintiffs and Respondents.

\* \* \*

The Legislature enacted Code of Civil Procedure section 425.16, commonly known as the anti-SLAPP statute, to prevent powerful plaintiffs from chilling a defendant's valid exercise of free speech rights.[1] But the Legislature later observed that commercial defendants were abusing "the anti-SLAPP statute by claiming their advertising impacted the public interest." (*Metcalf v. U-Haul International, Inc.* (2004) 118 Cal.App.4th 1261, 1267.) To combat this abuse, the Legislature enacted the commercial speech exemption, found in section 425.17, subdivision (c). When this exemption applies, the challenged speech or conduct is not protected by the anti-SLAPP statute. (*Metcalf*, at p. 1265.)

Here, BioCorRx, Inc. (BioCorRx) is a publicly traded company that is primarily engaged in the business of providing addiction treatment services and related medication. It issued several press releases that allegedly made misrepresentations and improperly disclosed confidential information about a treatment it was developing for opioid overdose. We find these statements fall within the commercial speech exemption because they were representations about BioCorRx's business operations that were made to investors to promote its goods and services through the sale of its securities.[2] Since these statements are not protected by the anti-SLAPP statute, we reverse the part of the trial court's order granting the anti-SLAPP motion as to the press releases. We affirm the unchallenged portion of the order striking unrelated allegations. We also affirm the order granting the anti-SLAPP motion as to Brady Granier, BioCorRx's president and director.

---

[1] All further undesignated references are to the Code of Civil Procedure. "'SLAPP' is short for 'strategic lawsuit against public participation.'" (*Bonni v. St. Joseph Health System* (2022) 83 Cal.App.5th 288, 293, fn. 1 (*Bonni*).)

[2] When used in relation to BioCorRx, the term "investors" includes persons or entities that had already invested in BioCorRx as well as potential investors.

2

I

FACTS AND PROCEDURAL HISTORY

VDM Biochemicals, Inc. (VDM) specializes in the synthesis and distribution of chemicals, reagents, and other specialty products for life science research. It owns a patent (the patent) for VDM-001, a compound with potential use as a treatment for opioid overdose. "VDM-001 is a 'drug product candidate' at a pre-clinical stage of its development" that still requires further pre-clinical development and clinical development before it can be utilized commercially.

BioCorRx is a publicly traded corporation located in Anaheim that provides addiction treatment services and medications for treating addiction. BioCorRx explained its business model in an Investor Presentation filed with the Securities and Exchange Commission (SEC) in November 2018 (the investor presentation). The investor presentation noted that "[t]he addiction treatment market represents a multi-billion dollar industry . . . ." It then explained BioCorRx's two-prong approach for operating in that market. First, it "[s]eek[s] FDA approval of new medications to treat alcohol and opioid use disorders." Second, it operates the "revenue generating BioCorRx[] Recovery Program [that] combin[es] medication and therapy."

In September 2018, VDM and BioCorRx entered into a Mutual Nondisclosure & Confidentiality Agreement (the NDA), which restricted each party's disclosure of confidential information as they discussed forming a business relationship.

A month later, VDM and BioCorRx signed a Letter of Intent to Enter Definitive Agreement to Acquire Stake in Intellectual Property (the letter of intent). The letter of intent memorialized the parties' "shared desire to sincerely explore the entering into a formal agreement whereby BioCorRx shall partner [with VDM] to develop and commercialize" VDM-001 as a treatment for opioid overdose. The parties agreed "to use best efforts to enter into a definitive agreement within 6 months from" the letter of intent.

3

The letter of intent also granted BioCorRx a "right of first refusal to acquire up to a 49%" equity stake in the patent.

A declaration from VDM's chief executive officer states that VDM understood BioCorRx needed to validate some of the information in the patent and confirm that VDM-001 could treat opioid overdose. Evidence in the record also shows BioCorRx provided funds from April 2019 to October 2020 to conduct preclinical studies, engage consultants, and provide other resources to develop VDM-001.

BioCorRx issued press releases concerning VDM and VDM-001 in October 2018, December 2019, and March, May, August, and November 2020 (together, the press releases). The initial press release in October 2018, "announced the execution of a letter of intent (LOI) with [VDM], subject to execution of a definitive agreement, whereby the companies would partner to further develop and commercialize VDM's new opioid antagonist molecule, VDM-001 . . . . Under the agreement, BioCorRx has the right of first refusal to acquire up to a 49% ownership stake in VDM-001 . . . . Both parties have agreed to use best efforts to enter into a definitive agreement within 6 months from the date of the LOI execution on October 1, 2018." The subsequent press releases provided general updates on BioCorRx's development of VDM-001 as a treatment for opioid overdose.

After signing the letter of intent, BioCorRx and VDM apparently exchanged numerous e-mails and draft agreements but never signed a formal contract concerning VDM-001. Their relationship eventually soured.

BioCorRx filed a complaint (the complaint) against VDM in March 2022. Among other things, BioCorRx alleged that although the parties had not signed a formal contract, they had reached an agreement via e-mail concerning VDM-001's development in March 2019 (the alleged agreement). Under the alleged agreement, BioCorRx obtained an ownership interest in VDM-001 based on the amount of research and development funding it provided. It also retained its right to purchase an additional

4

interest in VDM-001 of up to 49 percent. But after BioCorRx informed VDM of its preclinical studies' findings, VDM purportedly repudiated the alleged agreement and interfered with BioCorRx's right to purchase an additional ownership interest in VDM-001, among other things.

VDM filed a cross-complaint (the cross-complaint) against BioCorRx and its president and director, Brady Granier.[3] Generally, it alleged BioCorRx had induced VDM to disclose confidential information under the NDA and to enter the letter of intent. VDM claimed BioCorRx never intended to abide by the NDA or to enter into a formal agreement concerning VDM-001. Rather, it entered these agreements to attract investors and boost its stock price. BioCorRx allegedly perpetrated this scheme by issuing the press releases, which contained certain quotes from Granier. The press releases purportedly included confidential information and misrepresentations about BioCorRx's relationship with VDM and VDM-001's development. VDM also asserted BioCorRx improperly failed to redact confidential information in the complaint (the unredacted statements). Based on these allegations, the cross-complaint set forth causes of action for breach of the NDA, breach of the letter of intent, breach of the implied covenant of good faith and fair dealing, fraud, misappropriation of trade secrets, unjust enrichment, and violations of Business and Professions Code section 17200.

In response, BioCorRx and Granier filed an anti-SLAPP motion seeking to strike all the allegations from the cross-complaint concerning the press releases. They claimed these statements were matters of public interest under section 425.16, subdivisions (e)(3) or (4). They also sought to strike the cross-complaint's allegations concerning the unredacted statements.

VDM filed a motion to take discovery to oppose the anti-SLAPP motion. Generally, it sought to depose a BioCorRx representative on various topics concerning

_____

[3] VDM's chief executive officer, David Martirosyan, was also a cross-complainant.

5

the press releases, and it also sought documents related to those topics.  The trial court found VDM had failed to establish good cause to conduct discovery and denied the motion.

After its discovery motion was denied, VDM filed an opposition to the anti-SLAPP motion.  Primarily, it argued the press release statements were exempt from the anti-SLAPP statute under the commercial speech exemption.  It also asserted these statements were not protected activity under section 425.16, because they did not concern a matter of public interest.  It only offered token opposition to a portion of the anti-SLAPP motion directed to the unredacted statements.

The trial court granted the anti-SLAPP motion as to both BioCorRx and Granier.  As to the press release statements, it found VDM had failed to establish all the elements of the commercial speech exemption.  It also held these statements were protected speech under section 425.16, based on authority finding medical care and treatment to be topics of public interest.  As for the unredacted statements, the court ruled they were protected activity and privileged.

VDM appeals the ruling.  It makes three arguments.  First, the anti-SLAPP statute does not apply to the press release statements because they fall within the commercial speech exemption.  Second, the press release statements are not protected activity under the anti-SLAPP statute and, even if they are, VDM has shown a probability of prevailing on its claims.  Third, the trial court erred by denying VDM's motion to take discovery.  As to the portion of the order concerning BioCorRx, we agree with VDM's first argument and, therefore, do not address the remaining contentions.  As to the portion of the order concerning Granier, VDM has not shown any error. [4]

---

[4] VDM does not challenge the portion of the court's order striking the cross-complaint's allegations concerning the unredacted statements.

## II

## DISCUSSION

*A. The Anti-SLAPP Statute*

Section 425.16 was enacted "'to prevent and deter "lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." [Citation.] Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought "'to prevent SLAPPs by ending them early and without great cost to the SLAPP target'" [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.'" (*Bonni*, *supra*, 83 Cal.App.5th at p. 298.)

"Anti-SLAPP motions are reviewed through a two-step process. 'First, the court must determine "whether the defendant has made a threshold showing that the challenged cause of action" arises from an act in furtherance of the right of petition or free speech in connection with a public issue. [Citation.] Second, the court must "determine whether the plaintiff has demonstrated a probability of prevailing on the claim." [Citation.] If the defendant makes a threshold showing that the cause of action arises from an act in furtherance of the right of petition or free speech in connection with a public issue and the plaintiff fails to demonstrate a probability of prevailing, then the court must strike the cause of action [citation] and award the defendant "attorney's fees and costs."'" (*Bonni*, *supra*, 83 Cal.App.5th at p. 298.)

We begin by analyzing the ruling as to BioCorRx and then turn to Granier.

*B. The Commercial Speech Exemption Applied to BioCorRx*

The Legislature later became "'concerned about the "disturbing abuse" of the anti-SLAPP statute.'" (*JAMS, Inc. v. Superior Court* (2016) 1 Cal.App.5th 984, 992.) To curb this abuse, the Legislature enacted section 425.17 to exempt certain actions from the anti-SLAPP statute, including a specific exemption for commercial speech. (*Ibid*.)

The commercial speech exemption applies "when (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17(c)(2)." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 30 (*Simpson*).)

The commercial speech exemption is a threshold issue. If applicable, the challenged speech or conduct is not protected by the anti-SLAPP statute. (*Xu v. Huang* (2021) 73 Cal.App.5th 802, 806-807.)

We review de novo the trial court's ruling on the commercial speech exemption. (*Xu v. Huang*, *supra*, 73 Cal.App.5th at p. 811.) The exemption is narrowly construed. (*Id*. at p. 813.) VDM has the burden of establishing each element, and we accept as true the evidence favorable to VDM. (*Id*. at pp. 813, 815.) We do not consider the merits of VDM's claims when analyzing whether the exemption applies. (*JAMS, Inc. v. Superior Court*, *supra*, 1 Cal.App.5th at p. 993.)

8

*1. BioCorRx's primary business*

Under this prong, we must determine whether BioCorRx is "a person *primarily* engaged in the business of selling or leasing goods or services." (§ 425.17, subd. (c), italics added.) VDM argues BioCorRx is primarily engaged in the business of providing addiction treatment services and selling related medications. It also contends BioCorRx sells and promotes its securities. In response, BioCorRx maintains it is primarily engaged in research and development. It cites evidence showing nearly all its revenues from 2019 to 2021 were from research and development grants. Likewise, nearly all its expenditures in these years were on research and development, with only a small fraction of funds spent on other costs of sales. There are no similar cases in which a company argued this prong was not met because it obtained most of its funds through grants that were used to research and develop new commercial products. We are not persuaded by this novel argument. As explained below, in analyzing this prong we cannot simply look at the percentage of funds BioCorRx allocates to or obtains from research and development. We must look at the business purpose behind these activities.

The record shows BioCorRx is primarily engaged in the business of providing medication and treatment services to people struggling with alcohol, opioid, and other addictive disorders. For example, in the press releases, BioCorRx consistently describes itself as "an addiction treatment solutions company offering a unique approach to the treatment of substance use and other related disorders." In one press release, it calls itself "a leader, developer and provider of advanced solutions in the treatment of addiction and related disorders."

Likewise, the investor presentation describes BioCorRx's business as providing addiction treatment services and developing commercial medication to treat substance abuse. For instance, the investor presentation states that "[t]he addiction treatment market represents a multi-billion dollar industry which is undergoing a radical transformation to new treatment modalities involving medications." It then explains that

9

"BioCorRx has two business models for treating addiction aligned with this change:" (1) "Seeking FDA approval of new medications to treat alcohol and opioid use disorders"; and (2) "[r]evenue generating BioCorRx® Recovery Program combining medication and therapy."

The BioCorRx® Recovery Program is "a non-addictive, medication-assisted treatment . . . program" that consists of two components:  (A) an implant that delivers naltrexone, a nonaddictive medicine that reduces alcohol and opioid cravings, and (B) one-on-one counseling.  The "Recovery Program is distributed at partner clinics across the US."  "Fees are paid to BioCorRx per program sold by independent treatment providers."  Around the time of the investor presentation, BioCorRx also began offering a medication-assisted weight loss program called "The UnCraveRx™ Weight Loss Program."

BioCorRx argues it is primarily a research and development company given the amount of funds it expends on and receives from such activities.  But this argument relies on a narrow interpretation of the word "primarily" that only focuses on a company's finances.  We cannot solely look at the amount of money BioCorRx spends on research and development or the amount it obtains from such activities.  Rather, we must look at the entire context of its research and development efforts when analyzing whether it is "primarily engaged in the business of selling" goods or services.  (§ 425.17, subd. (c).)  Put differently, what is the purpose of its research and development?

Here, the record shows BioCorRx conducts research and development to create commercial products either for sale or for use in its treatment services.  As explained above, one of BioCorRx's core businesses involves "[s]eeking FDA approval of new medications to treat alcohol and opioid use disorders."  The investor presentation also explains that BioCorRx's research and development subsidiary, BioCorRx Pharmaceuticals, was developing several commercial drugs to treat these disorders as part of BioCorRx's "Product Pipeline."  Further, BioCorRx's weight loss program uses a

10

proprietary naltrexone implant developed by BioCorRx Pharmaceuticals.  We also note that during oral argument, BioCorRx conceded it conducts research and development to create commercial products.

BioCorRx is not a research and development company.  It is a health services company that conducts research and development to further its treatment programs and line of commercial medications.  Thus, it is primarily engaged in the business of selling goods or services.

### 2. *Nature of the representations*

Next, VDM argues the statements at issue are representations of fact about BioCorRx's business operations.  (See *Simpson*, *supra*, 49 Cal.4th at p. 30.)  We agree.

The portions of the press releases at issue allege BioCorRx disclosed confidential information about VDM-001's test results and made misrepresentations (1) about BioCorRx's role in the "development" of VDM-001, (2) about the progress of VDM-001's "development," (3) about BioCorRx's business relationship with VDM, and (4) that it owned VDM-001.[5]  Since there are only a few statements at issue, we include them below.

- March 2020 press release:  "'We [(BioCorRx)] also continue to move ahead with VDM-001, a new molecule being developed to reverse opioid overdose through our partnership with [VDM].  Preclinical studies are currently ongoing, and we anticipate having minimal delays due to COVID-19.  VDM-001 may represent an effective alternative to naloxone in the overdose reversal market.  Early preclinical

---

[5]  We put the word "development" in quotes since VDM alleges BioCorRx misrepresented that VDM-001 was being developed.  VDM claims BioCorRx was only validating the results of prior preclinical studies conducted by VDM-001's inventor in another country.  We do not address this dispute in this opinion.

11

data showed that the effects of fentanyl, which is responsible for thousands of deaths annually, may be prevented by VDM-001.'"

- May 2020 press release: "'We [(BioCorRx)] also continue to advance our preclinical studies with VDM-001, a new molecule being developed to reverse opioid overdose through our partnership with [VDM]. VDM-001 may represent an effective alternative to naloxone in the overdose reversal market. Early preclinical data was promising as the effects of fentanyl, which is responsible for thousands of deaths annually, may be prevented by VDM-001. We are currently conducting more preclinical studies to gain more knowledge about the viability of this novel molecule.'"

- August 2020 press release: "'BioCorRx Pharmaceuticals continues to work on preclinical studies of VDM-001, a new molecule being developed to reverse opioid overdose through our partnership with [VDM]. There are a few small preclinical studies currently underway and VDM-001 may represent an effective alternative to naloxone in the overdose reversal market. Fentanyl has become a major driving force behind the opioid epidemic in the U.S. In 2018 alone, 31,000 people died from synthetic opioid overdoses. We are very encouraged by some early preclinical data that showed the ability of VDM-001 to block analgesic effects of fentanyl in vivo. The current studies that are currently underway will hopefully allow us to gain more insight into VDM-001 and its viability to progress to further development.'"

- November 2020 press release: "'Our subsidiary, BioCorRx Pharmaceuticals Inc., . . . also continues to work on preclinical studies of VDM-001, a new molecule being developed to reverse opioid overdose. Fentanyl has become a major driving force behind the opioid epidemic in the US which continues to be exacerbated by the COVID-19 pandemic. We are very encouraged by some early preclinical data

that demonstrated the ability of VDM-001 to block analgesic effects of fentanyl in vivo.'"

The above statements are representations of fact. They provide updates concerning BioCorRx's relationship with VDM and VDM-001's development, including that preclinical studies are underway and early data from those studies.

The representations at issue also directly concern BioCorRx's business operations. The March, August, and November 2020 press releases are each labeled as a "Business Update," while the May 2020 press release is labeled as an "Update on Current Business Operations."

We also conclude these statements concern BioCorRx's business operations based on their content. In conducting our analysis, we must consider the above statements in the context of the prior press releases. BioCorRx's initial press release in October 2018, stated that "BioCorRx ha[d] the right of first refusal to acquire up to a 49% ownership stake in VDM-001." It also stated that VDM and BioCorRx were planning to partner "to develop and *commercialize* VDM-001." (Italics added.) Given this context, the statements at issue provided investors with updates on BioCorRx's development of a commercial treatment for opioid overdose. And, based on the initial press release, BioCorRx could share in any future profits generated from VDM-001 given its right to acquire an ownership stake. In other words, the statements at issue are about a business opportunity in line with one of BioCorRx's core business purposes: Developing medications to treat opioid addiction.

We are unpersuaded by BioCorRx's citation to *Hawran v. Hixson* (2012) 209 Cal.App.4th 256. In *Hawran*, a publicly traded genetic diagnostic testing company admitted the results of a certain test it was developing had been mishandled. Numerous lawsuits were filed against the company, and its stock price dropped. (*Id*. at pp. 263-264.) Hawran, the company's chief financial officer, resigned based on an agreement with the company that he would not be associated with the mishandling. (*Id*. at p. 264.)

13

The company issued a press release explaining the errors with the test and new remedial measures to prevent future mistakes. The press release also announced Hawran's resignation and stated that the company's board of directors had lost confidence in him following an investigation of the incident. (*Ibid*.) Hawran sued the company on grounds the press release painted him in a false light. (*Id*. at pp. 264-265.)

The company filed an anti-SLAPP motion, and Hawran asserted his claims fell within the commercial speech exemption. (*Hawran*, *supra*, 209 Cal.App.4th at p. 271.) The court disagreed, finding he had failed to show the statements arose from representations of fact about the company's business operations, goods, or services. Hawran argued his claims arose from the press release, which concerned the mishandling of the new test and the operational steps taken to address the problem. (*Id*. at p. 271.) But, as the court explained, Hawran's claims did not arise from those portions of the press release. Rather, they were based on the press release's statements about his resignation, which were not sufficiently related to the company's business operations, goods, or services. (*Id*. at pp. 272-273.)

Unlike *Hawran*, the statements at issue are not tangential to BioCorRx's business operations. Rather, they directly concern a business opportunity aligned with ones of BioCorRx's core businesses.

### 3. *Purpose of the representations and intended audience*

We address the third and fourth elements together. The third element asks whether "the statements at issue were made either for the purpose of obtaining approval for, promoting, or securing sales . . . , or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services." (*Simpson*, *supra*, 49 Cal.4th at p. 30.) The fourth asks whether the "intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer." (§ 425.17, subd. (c)(2); *Simpson*, at

14

p. 30.) We find both elements have been met primarily based on this District's decision in *Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769 (*Neurelis*).)

In *Neurelis*, Neurelis, Inc., and Aquestive Therapeutics, Inc., were each developing competing medications for the same seizure condition. (*Neurelis*, *supra*, 71 Cal.App.5th at p. 778.) Neurelis's medication was administered nasally, while Aquestive's was administered orally. (*Id.* at pp. 778-779.) Aquestive made various statements to investors about its drug. It filed a Form S-1 with the SEC, which stated its drug was further along than other competing drugs in development. (*Id.* at p. 780.) Aquestive's chief executive officer also stated during an investor call that survey data showed its drug was preferred by more than 80 percent of patients over nasal sprays. (*Id.* at pp. 781-782.) Neurelis sued Aquestive on various theories based on these investor statements. (*Id.* at p. 782.)

Aquestive filed an anti-SLAPP motion, which Neurelis opposed based on the commercial speech exemption. (*Neurelis*, *supra*, 71 Cal.App.5th at p. 782.) Aquestive argued the exemption did not apply because the statements at issue were made to investors and not to potential customers of either seizure medication under development. (*Id.* at p. 787.) It claimed the exemption would only apply to statements made to "customers or potential customers of its [drugs] and not investors, who only buy its stock. Aquestive further point[ed] out that it is not in the business of selling securities and securities are just a means by which it finds investment for its 'true business' of 'selling . . . pharmaceuticals for medical conditions.'" (*Id.* at p. 789.)

The court rejected Aquestive's argument. It noted that Aquestive's seizure medication was still in development when the investor statements were made. "Thus, there were no consumers that would have been able to purchase [Aquestive's drug] when the comments were made. However, clearly the audience of Aquestive's statements was in a position to 'otherwise influence' a 'potential buyer' of [the drug] by investing in

15

Aquestive to help ensure that company brought [the drug] to market before other competing drugs . . . ." (*Neurelis*, *supra*, 71 Cal.App.5th at p. 790.)

While the statements at issue here pertained to a developing drug that was not available for purchase, they were made to promote the sales of BioCorRx's goods and services through the sale of its securities. Similar to *Neurelis*, BioCorRx sought investment to fund its business of providing addiction treatment services and selling related medications. (See *Neurelis*, *supra*, 71 Cal.App.5th at p. 790.)[6] As stated above, the October 2018 press release stated BioCorRx was planning to partner with VDM "to develop and commercialize VDM-001" and that BioCorRx had the right to purchase an ownership interest in VDM. The March, May, August, and November 2020 press releases generally stated VDM-001 was "being developed to reverse opioid overdose." Three of these press releases compared VDM-001 to competing drugs on the market, stating it could "'represent an effective alternative to naloxone in the overdose reversal market.'" Several press releases also highlight the fentanyl problem in the United States and stated that VDM-001 may prevent "'the effects of fentanyl, which is responsible for thousands of deaths annually.'"

The implication from the above statements is that there is a market for medication to combat opioid overdose, BioCorRx was developing such a medication, and investors should provide funds to continue that development. Thus, we conclude the press releases at issue were intended to attract investors that could "'otherwise influence'

---

[6] BioCorRx contends *Neurelis* is distinguishable because Aquestive conceded it was primarily engaged in the business of selling pharmaceuticals and securities. (See *Neurelis*, *supra*, 71 Cal.App.5th at p. 790.) We are unpersuaded by this argument. As we read *Neurelis*, the appellate court was concerned that Aquestive had allegedly made representations to increase its investment so it could "fund its 'true business' of 'selling . . . pharmaceuticals for medical conditions.'" (See *id.* at p. 790.) We find this akin to the situation here. Like Aquestive, the record shows BioCorRx operates in a similar field to pharmaceuticals and seeks investment to fund its primary business of providing addiction treatment services and related medications.

16

a 'potential buyer'" by investing in BioCorRx to help it continue to develop VDM-001 for commercialization. (See *Neurelis*, *supra*, 71 Cal.App.5th at p. 790.)

BioCorRx attempts to distinguish *Neurelis* by arguing the statements at issue were made to the public at large and not directly to investors. However, we can infer from the record that investors were the intended audience.

First, BioCorRx is a for profit, publicly traded company that sells and promotes the sale of its securities. The press releases all contain BioCorRx's ticker symbol (BICX) in bold. Thus, readers of the press releases could easily look up and purchase shares of BioCorRx. (See Koegler, *Here Come the Cybercops 2: Who Should Police Cybermarks?* (1998) 22 Nova L.Rev. 531, 535, fn. 30 [ticker symbols "represent stocks on the market"].)

Second, the press releases include safe harbor statements that inform investors of certain investing risks. (See *In re Copper Mountain Securities Litigation* (N.D. Cal. 2004) 311 F.Supp.2d 857, 866 [safe harbor statements can shield companies from securities fraud claims].) For instance, they state "[t]he information in this release includes forward-looking statements" that "involve known and unknown risks as well as uncertainties. Although [BioCorRx] believes that its expectations are based on reasonable assumptions, the actual results that [BioCorRx] may achieve may differ materially from any forward-looking statements, which reflect the opinions of the management of [BioCorRx] only as of the date hereof." (Italics omitted.)

Third, all the press releases at issue contain investor-specific contact information for BioCorRx. They list BioCorRx's e-mail address as "*investors*@BioCorRx.com." (Italics added.) They also include the e-mail address and phone number for BioCorRx's "Investor Relations" firm. (Boldfacing omitted.) Thus, the press releases invite investors to contact BioCorRx. In contrast, nothing in the press releases encourages scientists, researchers, or other members of the public to contact BioCorRx if they are interested in its research efforts.

17

Fourth, the statements about VDM-001 were made in the context of press releases labeled as "Business Update[s]." These "Business Update[s]" include news about BioCorRx's business operations and product pipeline and, as such, appear tailored to investors. (Boldfacing omitted.) For instance, the press releases from March, May, August, and November 2020, contain not only updates about VDM-001 but on BioCorRx's development of a new naltrexone implant for treating opioid and alcohol use disorders. The March and May 2020 press releases include updates on BioCorRx's drug treatment and weight loss programs. The March 2020 press release states that BioCorRx obtained a grant that would "substantially cover [its] financial costs towards FDA approval" of a naltrexone implant in development. Finally, the November 2020 press release reports the appointment of BioCorRx's new chief operating officer. It also announces a new partnership with "Truusight Health, a healthcare solutions and care navigation and management company, to bring the [BioCorRx's] Recovery Program to self-funded health plans."

Fifth, the press releases were distributed by Global Newswire. The record indicates Global Newswire "specializ[es] in the delivery of corporate press releases[,] financial disclosure[,] and multimedia content to the media, *investment community*, *individual investors*, and the general public." (Italics added.)

BioCorRx also contends the third element is not met when a publicly traded company promotes its own securities. It claims such an interpretation would make every publicly traded company "subject to the commercial speech exemption whenever it issued a press release." We disagree.

In *Neurelis*, Aquestive's statements also promoted the sale of its securities because its seizure medication was still in development and not available for purchase. (See *Neurelis*, *supra*, 71 Cal.App.5th at pp. 789-790.) Press releases only become subject to the commercial speech exemption when all four elements set forth above are met.

18

Further, as this Division previously explained, the Legislature enacted the commercial speech exemption because "commercial defendants were invoking the procedural protections of the anti-SLAPP statute by claiming their advertising impacted the public interest." (*Metcalf v. U-Haul International, Inc.*, *supra*, 118 Cal.App.4th at p. 1267.) The exemption was intended to curb this "'disturbing abuse' of the [anti-SLAPP] statute." (*Ibid.*) A company's promotion of its securities is simply another form of advertising. For instance, if a company makes misrepresentations while promoting its securities sales and is sued, the resulting lawsuit "does not involve a plaintiff attempting to limit a defendant's constitutionally protected free speech rights." (See *Neurelis*, *supra*, 71 Cal.App.5th at p. 790.) Rather, it involves bad advertising. Such lawsuits are "not the type of case[s] for which the anti-SLAPP statute was intended." (See *ibid.*)

Finally, BioCorRx argues *Neurelis* is distinguishable because Aquestive made statements about a direct competitor's (Neurelis's) product, and no such statements were made here. But the commercial speech exemption can be applied if a company makes statements about its own products, services, or business operations. (*Simpson*, *supra*, 49 Cal.4th at p. 30.)

## C. Granier

VDM has the burden of showing the court erred by granting the anti-SLAPP motion as to Granier. "This burden remains the same whether or not the respondent files a brief or provides argument or authority on an issue." (*Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 655.) As explained below, VDM's opening brief fails to make any reasoned argument showing the court erred by ruling in favor of Granier. Thus, the argument has been forfeited. (*Id.* at pp. 653 ["An appellant abandons an issue by failing to raise it in the opening brief"]; *City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670, 679, fn. 8 ["An appellate court is not required to examine undeveloped claims or to make arguments for the parties"].)

19

First, VDM has not made any reasoned argument that the commercial speech exemption applies to Granier. As set forth above, this exemption only applies when the relevant cause of action is asserted "against a person primarily engaged in the business of selling or leasing goods or services." (*Simpson*, *supra*, 49 Cal.4th at p. 30.) VDM's opening brief asserts its "claims are against persons (BioCorRx and Granier) primarily engaged in the business of selling goods or services." While it then explains how BioCorRx meets this element, it fails to make any argument that Granier is primarily engaged in the requisite business activities. Rather, the opening brief only contends he "made the challenged press-release statements in his capacity as BioCorRx's CEO and/or Director," with no further analysis. This statement does not explain why BioCorRx and Granier should be treated identically for purposes of the commercial speech exemption. VDM has sued Granier as an individual, and, generally, a corporation is distinct from its officers and directors. (See *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220.) As such, it is unclear whether BioCorRx's business activities can be imputed onto Granier when applying the commercial speech exemption. VDM's opening brief simply assumes they can but fails to provide any authority or argument for doing so. We will not make this argument on its behalf. (*City of Riverside v. Horspool*, *supra*, 223 Cal.App.4th at p. 679, fn. 8.)

Second, VDM has not shown Granier fails to meet either prong of the two-step anti-SLAPP analysis. (See *Bonni*, *supra*, 83 Cal.App.5th at p. 298.) Again, VDM's arguments conflate BioCorRx and Granier. But they are not synonymous. As set forth above, a corporation is generally distinct from its officers and directors. (See *Curci Investments, LLC v. Baldwin*, *supra*, 14 Cal.App.5th at p. 220.) VDM has not explained why statements Granier made on behalf of BioCorRx subject him to individual liability.

Besides, the statements made by Granier and BioCorRx do not entirely overlap. While Granier was quoted in several press releases, the press releases also contain statements that were *not* made by Granier. Put differently, the press releases are composed of Granier's statements and other statements that ostensibly are only attributable to BioCorRx. VDM's opening brief only discusses BioCorRx's statements generally. Indeed, as the opening brief explains, "this case concerns *statements made by BioCorRx* about the *ownership*, development, and control of a single, specific product, VDM-001—statements made to promote BioCorRx's *business*." (First italics added.) The opening brief fails to include any analysis of Granier's individual statements, nor does it explain why such an analysis is unnecessary. In fact, Granier is not even mentioned in the opening brief's discussion of the two-prong anti-SLAPP test.

In supplemental briefing, VDM contends the trial court failed to distinguish between BioCorRx and Granier in its analysis, so it did not address the two separately. But we review the court's ruling not its analysis. (*Doe v. McLaughlin*, *supra*, 83 Cal.App.5th at p. 654.) Thus, our review is limited to whether the trial court correctly ruled in favor of Granier, and VDM had the burden of showing that ruling was wrong. (*Id*. at pp. 654-655.) It did not meet that burden because it failed to provide any analysis of Granier's statements. Rather, its analysis focused on BioCorRx's statements without explaining how that same analysis applied to Granier.

21

III

DISPOSITION

We reverse the portion of the trial court's order striking the allegations from the cross-complaint concerning the press releases. We affirm the portion of the order striking the allegations concerning the unredacted statements, which VDM did not challenge on appeal. Likewise, we affirm the portion of the order granting Granier's anti-SLAPP motion. The matter is remanded for further proceedings. Each party shall bear their own costs on appeal.[7]

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

MOTOIKE, J.

---

[7] VDM's requests for judicial notice are denied as immaterial to our analysis. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)